## IN THE UNITED STATES BANKRUPTCY COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

In re

                            Case No.  08-31399

JOHN EDWARD CHAMBERS
d/b/a CHAMBERS FARM
f/d/b/a CHAMBERS DAIRY
PATRICIA STACEY CHAMBERS

                Debtors

### MEMORANDUM ON OBJECTION TO
### CONFIRMATION OF CHAPTER 12 PLAN

**APPEARANCES:**    WADE M. BOSWELL, ESQ.
                    Post Office Box 221
                    Knoxville, Tennessee  37901
                    Attorney for Debtors

                  WINCHESTER, SELLERS, FOSTER & STEELE, P.C.
                    E. Brian Sellers, Esq.
                    Post Office Box 2428
                    Knoxville, Tennessee  37901-2428
                    Attorneys for Citizens First Bank

                  JAMES M. SETTERS, ESQ.
                    Post Office Box 511
                    Chattanooga, Tennessee  37401
                    Attorney for C. Kenneth Still, Chapter 12 Trustee

                  RICHARD F. CLIPPARD, ESQ.
                  UNITED STATES TRUSTEE
                    Patricia C. Foster, Esq.
                    Howard H. Baker, Jr. United States Courthouse
                    800 Market Street
                    Suite 114
                    Knoxville, Tennessee  37902
                    Attorneys for United States Trustee

**RICHARD STAIR, JR.**
**UNITED STATES BANKRUPTCY JUDGE**

This contested matter is before the court on the Objection to Confirmation of Chapter 12 Plan filed by Citizens First Bank on July 31, 2008, as amended by the Amended Objection to Confirmation of Chapter 12 Plan (Amended Objection) filed on August 1, 2008. By its Amended Objection, Citizens First Bank objects to confirmation of the Chapter 12 Plan filed by the Debtors on June 30, 2008, as amended by the Amended Chapter 12 Plan (Amended Plan) filed on August 20, 2008.

A trial was held on October 28, 2008. The record before the court consists of thirty-seven exhibits introduced into evidence, along with the testimony of four witnesses, Mike Griffith, an insurance agent, Thomas White, an appraiser, James David Harris, Senior Vice President and Senior Lending Officer for Citizens First Bank, and the Debtor, John Chambers.[1]

This is a core proceeding. 28 U.S.C. § 157(b)(2)(L) (2005).

# I

The Debtors own and operate a family farm located at 601 Chambers Road, Robbins, Tennessee, consisting of approximately 550 acres, upon which they grow corn and harvest hay.[2] Inadequate crops caused by drought caused the Debtors to default upon their financial obligations, including those to Citizens First Bank, the holder of four loans totaling $1,216,762.13. The loans are cross-collateralized and secured by the real property constituting the farm property in Scott

---

[1] The court also takes judicial notice, pursuant to Rule 201 of the Federal Rules of Evidence, of undisputed material facts of record in the Debtors' bankruptcy case file.

[2] The Debtors converted from dairy and crop farming exclusively to crop farming in May 2007.

2

County, Tennessee, together with all farm products, crops, livestock, rents, profits, income, inventory, equipment, accounts, general intangibles, government payments, insurance settlements, instruments, documents, chattel paper, and cash (Collateral). *See* COLL. TRIAL EXS. 1-4. In March 2008, following nonpayment, Citizens First Bank began foreclosure proceedings against its Collateral. The foreclosure proceedings were stayed, however, when the Debtors filed the Voluntary Petition commencing this case under Chapter 12 of the Bankruptcy Code on April 1, 2008.[3] Pursuant to an Agreed Order for Debtors' Use of Cash Collateral, Providing Adequate Protection, and Granting Post-Petition Liens entered on July 17, 2008, the Debtors were authorized to use cash collateral of Citizens First Bank in exchange for adequate protection in the form of a replacement lien in the Debtors' post-petition property, establishment of separate bank accounts for farm and personal uses, submission of written, monthly budgets to Citizens First Bank, the Chapter 12 Trustee, and the United States Trustee, and the requirement of approval by Citizens First Bank to sell or otherwise dispose of the Debtors' machinery, equipment, or other personal property.

On June 30, 2008, the Debtors filed their Chapter 12 Plan, and objections to confirmation were filed by Citizens First Bank on July 31, 2008, by Vanderbilt Mortgage and Finance, Inc. on August 4, 2008, and by C. Kenneth Still, Chapter 12 Trustee, on August 5, 2008. The Debtors then filed the Amended Plan presently at issue on August 20, 2008, proposing sixty monthly installment payments over the 120-month life of the Amended Plan by making six monthly payments to the Chapter 12 Trustee of $20,860.00 during each twelve-month period from October through March of each year. The Amended Plan provides for the treatment of five classes of claims as follows:

---

[3] Citizens First Bank has stipulated that the Debtors qualify as family farmers under 11 U.S.C. § 101(18) (2005), thus making them eligible for relief under Chapter 12 of the Bankruptcy Code.

Class 1, Administrative Claims; Class 2, Secured Claims; Class 3, Priority Claims; Class 4, Leases and Executory Contracts; and Class 5, General Unsecured Claims. TRIAL EX. 5 at 5-11.

With respect to the Class 2 Secured Claims, the Amended Plan provides for 15 separate sub-classes as follows: (1) Claim No. 1 filed by Agco Finance LLC in the amount of $10,787.35[4] secured by a tractor and cutter/loader, to be paid in full, plus 8% interest, through six (6) monthly payments of $282.00 during each twelve-month period, or $1,692.00 annually; (2) Claim No. 2 filed by AgriCredit Acceptance LLC in the amount of $31,897.25 secured by a McCormick tractor, to be paid in full, plus 8% interest, through six (6) monthly payments of $775.00 during each twelve-month period, or $4,650.00 annually; (3) Claim No. 3 filed by AgriCredit Acceptance LLC in the amount of $87,102.96 secured by a McCormick tractor and baler, to be paid in full, plus 7.2% interest, through six (6) monthly payments of $2,042.00 during each twelve-month period, or $12,252.00 annually; (4) Claim No. 28 filed by Citizens Auto Finance in the amount of $5,143.38 secured by a 2003 Mitsubishi Eclipse, to be paid in full, plus 5.59% interest, through six (6) monthly payments of $198.00 over each twelve-month period, or $1,188.00 annually; (5) Claim No. 23 filed by Citizens First Bank in the amount of $111,301.64, secured by the farm and equipment, to be paid in full, plus 7% interest, through six (6) monthly payments of $2,586.00 over each twelve-month period, or $15,516.00 annually; (6) Claim No. 25 filed by Citizens First Bank in the amount of $356,848.10 secured by the farm, equipment, and motor vehicles, to be amortized at 8% interest over 300 months and paid through six (6) monthly payments of $5,508.42 over each twelve-month period, or $33,050.52 annually; (7) Claim No. 26 filed by Citizens First Bank in the amount of $37,583.85

---

[4] An Amended Claim filed by Agco Finance LLC on April 4, 2008, reduced its claim to $10,687.57.

4

secured by the farm, equipment, and motor vehicles, to be paid in full, plus 8% interest, through six

(6) monthly payments of $912.00 over each twelve-month period, or $5,472.00 annually; (8)  Claim

No. 24 filed by Citizens First Bank in the amount of $711,028.54, with Citizens First Bank

> to receive all amounts available after payment of the other obligations under the Plan, but a minimum of six (6) payments of approximately $2.000.00 [sic] during each 12 month period beginning November 2008 ($6,000.00 estimated annually).  After the 5th year, all payments previously allocated to real property taxes or the automobile shall be paid to the Bank.
>
>  In addition, the Bank shall receive, on or before March 31st of each year, direct payment by the debtors of a lump sum amount to pay the balance of interest due for the year.  The first payment of additional interest will cover the period from the filing of their bankruptcy on April 1, 2008, through March 31, 2009.  The Bank shall also receive an additional $10,000.00 to be paid on the outstanding principal balance by March 31, 2009.  In addition to the interest payment, the debtors will pay $20,000.00 on the outstanding balance in 2010 and $25,000.00 on the outstanding balance annually on March 31st through the remainder of the plan.  Failure to make the interest or principal payment in any year shall result in the debtors selling the "river front" portion of the farm by June 30th of that year and paying the net proceeds to the Bank (which should be a minimum of $300,000.00).  Any junior lien holder shall release its lien on any portion sold.
>
>  All unpaid interest and principal will be due and owing to the Bank within ninety (90) days of completion of the Plan, dismissal (either voluntarily or involuntarily) of the Plan or discharge of the debtors.  If the debtors have not refinanced with the Bank, or obtained other financing by the end of the plan, the debtors shall sell the farm within the 90 day period, payment the Bank in full;

(9)  Claim No. 15 filed by Farm Credit Services of Mid-America, FLCA, in the amount of

$58,609.70 secured by equipment, to be paid in full, plus 8% interest, through six (6) monthly

payments of $1,424.00 over each twelve-month period, or $8,544.00 annually; (10)  Claim No. 10

filed by First National Bank of Tennessee in the amount of $5,357.05 secured by a front-end loader,

to be paid in full, plus 8% interest, through six (6) monthly payments of $130.00 over each

twelve-month period, or $780.00 annually; (11)  Claim No. 16 filed by GE Consumer Finance in the

amount of $1,126.77 as secured by a Cub Cadette mower, to be paid as unsecured due to insufficient

documentation; (12)  Claims No. 5, 6, and 7 for Scott County real property taxes as follows:

> A.  Claim No. 5 filed by the Scott County Chancery Court in the amount of $6,453.03 for delinquent real property taxes, to be paid in full, plus 12% interest, through six (6) monthly payments of $288.00 over each twelve-month period, or $1,728.00 annually;

> B.  Claim No. 6 filed by the Scott County Chancery Court in the amount of $496.19 for delinquent real property taxes, to be paid in full, plus 12% interest, through six (6) monthly payments of $50.00 over each twelve-month period, or $300.00 annually;

> C.  Claim No. 7 filed by the Scott County Trustee in the amount of $4,986.48 for 2006-2007 real property taxes, to be paid in full, plus 12% interest, through six (6) monthly payments of $222.00 over each twelve-month period, or $1,332.00 annually;

(13)  Claim No. 22 filed by Vanderbilt Mortgage Company in the amount $51,310.19 secured by a

2000 Clayton Mobile Home owned by Sampson Smith together with one acre of the Debtors' real

property, to be paid outside the Plan by Sampson Smith; (14)  Claim No. 29 filed by Scott Farmers

Cooperative in the amount of $76,000.00 secured by the farm, to be paid in full, plus 8% interest,

through six (6) monthly payments of $1,846.00 over each twelve-month period, or $11,076.00

annually; and (15)  Claim No. 30 filed by Citizens First Bank in the amount of $3,856.25 secured

by a 1999 Pontiac Firebird owned by Josey Chambers but co-signed by the Debtor, Stacey

Chambers, to be paid outside the Plan by Josie Chambers.  Trial Ex. 5 at 5-10.

Vanderbilt Mortgage and Finance Company, Inc. withdrew its objection to confirmation on

August 29, 2008, following the filing of the Amended Plan, and the Chapter 12 Trustee, through an

appearance by the United States Trustee, withdrew his objection immediately prior to trial on

October 28, 2008. Only the Objection to Confirmation filed by Citizen First Bank remains

6

unresolved.  The issues, as defined by the parties in their Joint Statement of Confirmation Issues filed on October 23, 2008, are as follows:

(1) Whether the Plan is feasible pursuant to 11 U.S.C. § 1225(a)(6);

(2) Whether the Plan as proposed complies with 11 U.S.C. § 1222(c) regarding the length of the Plan, in relation to the exceptions stated in 11 U.S.C. § 1222(b)(5) and (b)(9) as to the treatment of certain secured claims, including specifically the claims of Citizens First [Bank];

(3) To the extent the Plan seeks to implement the provisions of 11 U.S.C. § 1222(b)(5) and (b)(9), and/or (b)(2) in regard to the claims of secured creditors such as Citizens First [Bank], in order to extend the payments on such claims beyond the limit of five (5) years stated in 11 U.S.C. § 1222(c), whether such treatment is "fair and equitable", similar to the requirements established by case law under Chapter 11, and/or whether such treatment is unreasonable and inconsistent with industry standards, as well as Citizens First [Bank's] standards for terms it would extend to such a borrower under the circumstances;

(4) With respect to the secured claims of Citizens First [Bank], whether the Debtors have proposed a plan which pursuant to 11 U.S.C. § 1225(a)(5)(B) provides that the value, as of the effective date of the plan, of property to be distributed under the Plan on account of such claim is not less than the allowed amount of such claim, as determined in accordance with 11 U.S.C. § 506(a), inasmuch as Citizens First [Bank] has not accepted the Plan, and the Plan does not surrender the property securing the Claims to Citizens First [Bank];

(5) Whether the Debtors' Chapter 12 Plan has been proposed in good faith and not by means forbidden by law pursuant to 11 U.S.C. § 1225(a)(3), pursuant to the "totality of the circumstances" test or other caselaw-generated tests listing factors to be considered in determining bad faith;

(6) Whether the Plan provides for the submission of all or such portion of future earnings or other future income of the Debtors to the supervision and control of the Trustee as is necessary for the execution of the Plan pursuant to 11 U.S.C. § 1222(a)(1); and

(7) Whether, within the class of secured claims, the Plan provides the same treatment for each claim within said class, or whether the Plan unfairly discriminates against Citizens First [Bank's] claims.

**II**

Chapter 12, which is modeled after Chapter 13, was enacted "in response to the agricultural debt crisis of the mid-1980s," *Traders State Bank v. Mann Farms, Inc. (In re Mann Farms, Inc.)*, 917 F.2d 1210, 1214 (9th Cir. 1990), and "was intended to enable family farmers to retain their farms while reorganizing their financial affairs." *In re Lockard*, 234 B.R. 484, 490 (Bankr. W.D. Mo. 1999).  Confirmation of a Chapter 12 plan is governed, generally, by 11 U.S.C. § 1225 (2005), which, as material to the resolution of this contested matter, provides:

(a)  Except as [otherwise] provided . . ., the court shall confirm a plan if—

> (1) the plan complies with the provisions of this chapter and with the other applicable provisions of this title;
>
> . . . .
>
> (3) the plan has been proposed in good faith and not by any means forbidden by law;
>
> . . . .
>
> (5) with respect to each allowed secured claim provided for by the plan—
>
> > . . . .
> >
> > (B)(i) the plan provides that the holder of such claim retain the lien securing such claim; and
> >
> > (ii) the value, as of the effective date of the plan, of property to be distributed by the trustee or the debtor under the plan on account of such claim is not less than the allowed amount of such claim; [and]
>
> (6) the debtor will be able to make all payments under the plan and to comply with the plan[.]

11 U.S.C. § 1225(a).  If a party in interest does not agree with its treatment in a proposed Chapter

12 plan, it may object.  *See* 11 U.S.C. § 1224 (2005).

### A

The focal point of the Citizens First Bank's objection relates to the feasibility of the

Amended Plan.  Feasibility "is fundamentally a factual question since it necessarily depends upon

a determination of the reasonable probability of payment."  *In re Howard*, 212 B.R. 864, 878 (Bankr.

E.D. Tenn. 1997).  When making a determination concerning feasibility, a debtor's proposed plan

payments must be analyzed in light of projected income and expenses in order to ascertain whether

the debtor has a likely ability to make all payments required under the plan.  *In re Elk Creek Salers,*

*Ltd.*, 286 B.R. 387, 396 (Bankr. W.D. Mo. 2002).  "Technical feasibility alone, however, is

insufficient.  The plan must also be realistic; the debtors must be able to do what they are proposing."

*Howard*, 212 B.R. at 880.

Debtors bear the burden of proof that a Chapter 12 plan is feasible; nevertheless, "[b]ecause

the purpose of Chapter 12 is to promote the reorganization attempts of family farmers, courts

generally give debtors the benefit of the doubt on the issue of feasibility, provided a reasonable

probability of success is established."  *Lockard*, 234 B.R. at 492.  They are not required to guarantee

"the ultimate success" of their plan "but only to provide a reasonable assurance that the plan can be

effectuated, and that reasonable assurance must rise above 'bare agronomic feasibility.'"  *In re*

*Wilson*, 378 B.R. 862, 891 (Bankr. D. Mont. 2007) (quoting *Miller v. Nauman*, 213 B.R. 355, 358

(B.A.P. 9th Cir. 1997)).  "Sincerity, honesty and willingness are not sufficient to make the plan

9

feasible, and neither are any visionary promises. The test is whether the things which are to be done after confirmation can be done as a practical matter under the facts." *Lockard*, 234 B.R. at 492 (quoting *Clarkson v. Cooke Sales and Service Co. (In re Clarkson)*, 767 F.2d 417, 420 (8th Cir. 1985)); *see also In re Michels*, 301 B.R. 9, 17 (Bankr. N.D. Iowa 2003) ("A plan projecting a marked increased in profitability with no explanation of the cause is not confirmable."); *Howard*, 212 B.R. at 879 (holding that feasibility "must be based on objective facts rather than wishful thinking.").

Based upon the financial records entered into the record and the Debtor's[5] own testimony, the court finds that the Amended Plan is highly speculative, premised upon too many uncertainties, and is, therefore, not feasible.

Under the terms of the Amended Plan, the Debtors propose to make six (6) monthly payments of $20,862.00 each to the Chapter 12 Trustee during each twelve-month period from October through March for a total of sixty installment payments during the 120-month life of the Amended Plan. With the exception of the treatment provided for Citizens First Bank in its Claim No. 24 in the amount of $711,028.54, the Amended Plan proposes six (6) monthly payments to each secured creditor for each year over the life of the plan and payment in full to unsecured creditors within the first sixty months of the plan. As evidenced by Trial Exhibit 13, the breakdown of payments to be made by the Chapter 12 Trustee under the Amended Plan is summarized as follows:

---

[5] Because Mrs. Chambers did not testify, all singular references herein to the Debtor are references to Mr. Chambers.

10

| Claim | Amount | Creditor/Payee | Mo. Payment | Annual Payment |
|---|---|---|---|---|
| | | **Administrative Claims** | | |
| | $ 30,215.00 | C. Kenneth Still, Trustee | $ 1,007.00 | $ 6,043.00 |
| | $ 12,500.00 | Wade M. Boswell, Esq. | $ 417.00 | $ 2,500.00 |
| | | **Priority/Secured** | | |
| 5 | $ 6,453.03 | Scott Co. Chancery Court (5 years) | $ 288.00 | $ 1,728.00 |
| 6 | $ 496.19 | Scott Co. Chancery Court (2 years) | $ 50.00 | $ 300.00 |
| 7 | $ 4,986.48 | Scott County Trustee | $ 222.00 | $ 1,332.00 |
| | | **Secured** | | |
| 1 | $ 10,787.35 | AGCO Finance LLC | $ 282.00 | $ 1,692.00 |
| 2 | $ 31,897.28 | AgriCredit Acceptance LLC | $ 775.00 | $ 4,650.00 |
| 3 | $ 87,102.96 | AgriCredit Acceptance LLC | $ 2,042.00 | $ 12,252.00 |
| 10 | $ 5,357.05 | First National Bank of TN | $ 130.00 | $ 780.00 |
| 15 | $ 58,609.70 | FCS of Mid-America | $ 1,424.00 | $ 8,544.00 |
| 23 | $111,301.64 | Citizens First Bank | $ 2,586.00 | $ 15,516.00 |
| 24 | $711,028.54 | Citizens First Bank | $ 1,000.00 | $ 6,000.00 |
| 25 | $356,848.10 | Citizens First Bank | $ 5,508.42 | $ 33,050.52 |
| 26 | $ 37,583.85 | Citizens First Bank | $ 912.00 | $ 5,472.00 |
| 28 | $ 5,143.38 | Citizens Auto Finance (5 years) | $ 198.00 | $ 1,188.00 |
| 29 | $ 76,000.00 | Scott Farmers Co-Op | $ 1,846.00 | $ 11,076.00 |

**Unsecured**

$67,073.00 - $8,000.00 + $1,126.77 = $60,199.77          $ 2,006.66          $ 12,040.00

$20,694.08          $124,163.52

**Annual Payments**

| Claim | Amount | Creditor/Payee | Interest | Principal | Balance |
|---|---|---|---|---|---|
| 24 | $711,028.54 | Citizens First Bank | $50,883.00 | $10,000.00 | $701,029.00 |
| | | Year 2 | $50,083.00 | $20,000.00 | $681,029.00 |
| | | Year 3 | $48,083.00 | $25,000.00 | $656,029.00 |
| | | Year 4 | $46,482.00 | $25,000.00 | $631,029.00 |
| | | Year 5 | $44,482.00 | $25,000.00 | $606,029.00 |

Payments on principal for years 6 through 10
also include annual amounts that had previously
been paid to Scott County Court/Trustee ($3,360.00)
and Citizens Auto Finance ($,1,188.00) rounded
to $4,550.00

| | | | |
|---|---|---|---|
| Year 6 | $ 42,482.00 | $ 29,550.00 | $576,479.00 |
| Year 7 | $ 40,118.00 | $ 29,550.00 | $546,929.00 |
| Year 8 | $ 37,754.00 | $ 29,550.00 | $517,379.00 |
| Year 9 | $ 35,390.00 | $ 29,550.00 | $487,829.00 |
| Year 10 | $ 33,026.00 | $ 29,550.00 | $458,279.00 |

Balance of $458,279.00 is to be paid in a balloon payment at the end of the 10 year plan. However, the Chambers anticipate a voluntary sale of the "river front" at some time during the plan, netting a minimum of $300,000.00 which shall also be paid to the Bank.  Balance owed at the end of the plan should be less than $160,000.00.[6]

TRIAL EX. 13; *see also* TRIAL EX. 5.

Notwithstanding that the proposed $20,862.00 monthly payment would, in fact, cover the proposed individual payments to creditors, the Debtors have not proved their ability to make those monthly payments.  The proof is, in fact, to the contrary.

In support of their Amended Plan, the Debtors introduced several financial documents outlining their actual and projected income and expenses. The first document, marked as Trial Exhibit 11, is a statement of projected household income and expenses evidencing a net monthly income of $24,864.00 and expenses of $1,941.00, leaving a projected net monthly income of $22,923.00. The projected monthly income is allocated between the Debtors with $23,312.00

---

[6] The Amended Plan, itself, does not contain a provision that the Debtors shall, during the plan, sell the "river front" property with the proceeds to be paid to Citizens First Bank.  Instead, the Amended Plan provides that "Failure to make the interest or principal payment in any year shall result in the debtors selling the "river front" portion of the farm by June 30th of that year and paying the net proceeds to the Bank (which should be a minium of $300,000.00)." TRIAL EX. 5 at 8.

12

attributable to Mr. Chambers, representing a projected gross monthly income of $18,645.00 from

farming, $500.00 from refereeing,[7] and $4,167.00 from crop insurance and subsidies.  The monthly

income attributable to Mrs. Chambers is $1,552.00, representing her gross wages of $1,733.00, less

payroll deductions of $133.00 for social security and medicare and $48.00 for federal withholding

taxes.[8]  TRIAL EX. 11.  Their allotted household expenses are broken down as follows:  $20.00 for

household maintenance and repairs; $75.00 for electricity; $60.00 for water; $250.00 for telephone;

$12.00 for garbage pickup; $540.00 for groceries/household supplies; $200.00 for work/school

lunches; $16.00 for daycare; $10.00 for hair cuts/salon; $100.00 for charitable contributions; $100.00

for gifts (Christmas, birthdays); $2.00 for newspapers, magazines, books; $50.00 for drug expenses;

$21.00 for dry cleaning/laundry; $35.00 for clothing - self; $20.00 for clothing - children; $150.00

for automobile insurance; $20.00 for vehicle upkeep/maintenance; $140.00 for gas and oil; $5.00

for tags and licenses; $75.00 for recreation and entertainment; and $40.00 for taxes not already

deducted.  TRIAL EX. 11.  None of the farming expenses were included or deducted from the income

figure shown on Trial Exhibit 11.

With respect to their projected income, the Debtors also rely upon Trial Exhibit 8,[9] which

reflects projected income for 2008-2009 of $316,240.00 (Projected Income Statement), broken down

as follows:  (1)  $210,240.00 from the sale of crops – $45,000.00 from the sale of stored hay,

---

[7] The Debtor testified that he works as a basketball referee for all lower/secondary levels and is training to move up to the junior college level.

[8] Mr. Chambers testified that Mrs. Chambers is employed as a full-time secretary by the Oneida Water & Wastewater Department, and their family has obtained medical, dental, and vision insurance through her employment. *See also* TRIAL EX. 12.

[9] Trial exhibits 8 and 11 do not provide the same average projected income figures.

13

$18,000.00 from the sale of cut hay still in the field, $4,500.00 from hay sold to date, $112,500.00 from silage in the pit, $10,240.00 from silage sold to date, and $20,000.00 from shelled corn still in the field; (2) other farm income totaling $30,200.00, which represents custom farming for third parties of $13,000.00,[10] freight of $7,200.00, and $10,000.00 from an oil and gas lease; (3) $5,000.00 from Mr. Chambers' refereeing; (4) $20,800.00 from Mrs. Chambers' employment; and (5) $50,000.00 from guaranteed crop insurance.[11] TRIAL EX. 8.

Supplemental to the Projected Income Statement is Trial Exhibit 10, which reflects non-farm income of $5,000.00 per year from Mr. Chambers' refereeing, $22,000.00 per year from Mrs. Chambers' employment, and the "Best" and "Average" income projections for the years 2010-2018 (Long-Term Projections), broken down into the following four categories and projected gross receipts: (1) corn – 425 acres yielding a "best" of 110 bushels/acre, to be sold at $4.50/bushel, for a projected gross of $210,000.00, and an "average" of 85 bushels/acre, to be sold at $4.00/bushel, for a projected gross of $144,500.00; (2) hay – 250/200 acres yielding a "best" of 1,200 bales at the first cutting and 800 at the second cutting, to be sold at $45.00/bale, for a projected gross of $90,000.00, and an "average" of 1,000 bales at the first cutting and 750 at the second cutting, to be sold at $42.00/bale, for a projected gross of $73,500.00; (3) silage – yielding a "best" of 1,800 tons, to be sold at $45.00/ton for a projected gross of $81,000.00, and an "average" of 1,500 tons, to be sold at $45.00/ton, for a projected gross of $67,500.00; and (4) other farming – yielding a "best" of

---

[10] The Debtor cuts and rolls hay for other farmers.

[11] At trial, Mike Griffith, an insurance agent licensed with the State of Tennessee, testified that the Debtors have purchased a Multiple Peril Crop Insurance Policy through Fireman's Fund Insurance Company which will guarantee them proceeds of between $50,000.00 and $60,000.00. *See also* TRIAL EX. 21.

14

$20,000.00 from custom farming and $12,000.00 from freight for a projected gross of $32,000.00, and an "average" of $15,000.00 from custom farming and $9,000.00 from freight for a projected gross of $24,000.00. TRIAL EX. 10.[12] The Debtors also introduced a document evidencing projected overhead expenses in the amount of $86,000.00 for 2008-2009, and in the amount of $100,750.00 for the years 2009-2018 (Projected Overhead Statement). TRIAL EX. 9. Included among the expenses are charges for advertising, bank service charges, fertilizer and seed, fuel, insurance, office expenses, rent, repairs, supplies, taxes, telephone, utilities, and labor. TRIAL EX. 9.

The Debtors' projections are not, however, supported by their monthly operating reports filed under penalty of perjury in connection with this bankruptcy case from April through September 2008, which are summarized as follows. For April, the Debtors had total cash receipts of $28,804.90, consisting of $1,117.90 in wages from Mrs. Chambers' employment, $3,489.00 from custom farming, and $24,198.00 in emergency government drought relief funds, compared to household expenses of $1,476.23 and farming expenses of $13,773.67, resulting in a cash surplus of $13,555.00 for the month.[13] TRIAL EX. 15. For May, the Debtors had total cash receipts of $1,846.76, consisting of wages of $1,446.76 from Mrs. Chambers' employment, $400.00 from Mr. Chambers, and $0.00 in farming income, compared to household expenses of $1,504.06 and farming

---

[12] At trial, the Debtor testified that his "average" figures are area-based on the numbers provided by the United States Department of Agriculture.

[13] There are numerous discrepancies in the Debtors' monthly operating reports with regard to the monthly reconciliation of the cash and bank account balances at the beginning and ending of each month, wherein the figures did not appear to match up with the cash profits and losses for each month in light of the expenses and income. *See* TRIAL EXS. 15-20 at part III. Similarly, the ending balance for the prior month was not always properly carried over to the next month. *See* TRIAL EX. 16-18.

expenses of $13,497.06, resulting in cash losses of $13,154.46 for the month.[14] TRIAL EX. 16.  For

June, the Debtors had total cash receipts of $9,785.91, consisting of wages of $1,505.91 from Mrs.

Chambers' employment, $3,600.00 from custom farming, and $4,680.00 from lime hauled and

spread and hay sold, compared to household expenses of $1,449.41 and farming expenses of

$8,178.01, resulting in a cash surplus of $158.49 for the month.  TRIAL EX. 17.  For July, the Debtors

had total cash receipts of $4,931.20, consisting of wages of $1,241.20 from Mrs. Chambers'

employment, $3,600.00 from custom farming, and $90.00 from scrap metal taken off and the sale

of hay, compared to household expenses of $1,492.48 and farming expenses of $3,910.86, resulting

in cash losses of $472.14.  TRIAL EX. 18.  For August, the Debtors had total cash receipts of

$5,995.73, consisting of wages of $1,495.73 from Mrs. Chambers' employment, $2,400.00 from

custom farming, $900.00 from the sale of hay, and $1,200.00 received as a personal loan from a

nephew, compared to household expenses of $1,871.81 and farming expenses of $4,011.67, resulting

in cash profits of $198.60.[15] TRIAL EX. 19.  For September, the Debtors had total cash receipts of

$56,159.80, consisting of wages of $509.08 from Mrs. Chambers' employment, $54,300.00 from

a gas lease, and $1,350.00 from the sale of hay, compared to household expenses of $3,895.99 and

farming expenses of $33,664.38, resulting in a cash surplus of $18,599.43.[16] TRIAL EX. 20.

As the monthly operating reports establish, the Debtors' average cash receipts for the

six-month period of April through September 2008, was $3,350.67 from ordinary farming sources

---

[14] The actual cash loss should be $13,154.36 rather than $13,154.46.  *See* TRIAL EX. 16 at part II.

[15] The actual cash profits should be $112.25 rather than $198.60.  *See* TRIAL EX. 19 at part II.

[16] The Debtors' total cash receipts should reflect $56,159.08 rather than $56,159.80 and, accordingly, the cash profits should be $18,598.71 rather than $18,598.43.  *See* TRIAL EX. 20 at part I-II.

and $1,286.10 from Mrs. Chambers' employment and Mr. Chambers' refereeing, for an average

monthly income of $4,636.77.  While this income is sufficient to cover their average household

expenses of $1,948.33, it is not sufficient to also cover their average farming expenses of $12,839.28

per month, and it does not come close to allowing the Debtors to make the $20,862.00 payment

required under the Amended Plan for six months of each year.  Even including the guaranteed

insurance proceeds of approximately $60,000.00, which translates to an additional $5,000.00 per

month, the Debtors' income is insufficient.  Had they not received supplemental income of

$79,698.00 from outside sources, i.e., emergency government assistance, a personal loan from a

family member, and a one-time payment from a lease contract, during three of the six months, they

would not have had sufficient funds to operate at all.  Moreover, these supplemental receipts are not

consistent or routine, and the Debtors cannot rely upon this sort of extraordinary assistance in order

to fund their plan.

In their Plan Summary, the Debtors make the following statements with respect to their

ability to fund the plan:

> 2008 has started out as a better year for crops.  Debtors have already had a significant
> hay crop and contemplate an extremely good second cutting after allowing some
> additional time for more growth.  Debtors do not contemplate a third cutting of hay
> in 2008.  The debtors also anticipate a corn crop which will be utilized for both ear
> corn and silage that will be sold this winter and next spring.  Next spring (being the
> first time they will have sufficient funds for seed and fertilizer), the debtors plan to
> plant soybeans.  Finally, the debtors anticipate leasing more acreage which will
> increase revenue, and profit, in early 2010.

TRIAL EX. 5 at 2.  Yet, as evidenced in their monthly operating reports, their income from crops has

not been substantial, and while this may be due in large part to the drought of the last two years,

there is no guarantee that their crop income will not once again be affected by the weather at some

17

point over the next ten years.  Furthermore, there was no testimony concerning the introduction of

soybeans into the Debtors' crops, and none of the projected income documentation makes mention

of soybeans or other crops besides those presently grown and/or harvested by the Debtors – corn,

hay, and silage.  *See* TRIAL EXS. 8, 10.

The Debtors' projected figures additionally do not agree with several handwritten documents

relating to the Debtors' actual current farm income and expenses, as well as their own "worst case"

and "best case" scenarios.   Introduced into evidence as Trial Exhibit 37 is the Debtors'

summary/calculation document entitled "Chambers Farm 2008-2009," which Mr. Chambers testified

evidences the Debtors' projected net sales from hay and corn silage for 2008-2009 as follows:

| | |
|---|---|
| net income (monthly average) | $ 24,864 |
| Less household expenses | - 1,941 |
| Available funds (incl. insurance) | 22,923 |
| # of months | * 12 |
| Annual available funds | $275,076 |
| Less farm expenses | - 85,984 |
| | $189,092 |
| Less Chapter 12 payments | - 125,172 |
| | $ 63,920 |
| Less March 09 payments to Citizens First | - 60,882 |
| Unallocated funds | $ 3,038 |

TRIAL EX. 37.

Trial Exhibit 37 can be compared with the Debtors' reconciliation of income sources and

amounts marked as Trial Exhibit 38, which the Debtor testified was handwritten by his attorney and

includes crops in storage, those harvested, and those not yet harvested:

18

|  | $18,645 | monthly average income / all sources |
|---|---|---|
|  | x 12 | |
|  | 223,740 | annual |
|  | 223,750 | |
| - | 195,500 | (silage  112,500; hay  63,000; corn  20,000) |
|  | 28,250 | |
| - | 13,000 | custom farming for others |
|  | 15,250 | |
| - | 7,200 | freight |
|  | 8,050 | |
| - | 10,000 | oil & gas lease |
|  | 1,950 | |

### ANNUAL INCOME

|  | | |
|---|---|---|
| | 195,500 | crop sales |
| | 6,000 | refereeing |
| | 50,000 | insurance & subsidies |
| | 13,000 | custom farming |
| | 7,200 | freight |
| | 10,000 | oil & gas |
| 281,700 | | |
| 20,796 | | Stacey's |
| 302,496 | | |

TRIAL EX. 38.

These figures additionally differ from the Debtors' handwritten "worst case" and "best case" scenario summaries. With respect to their "worst case" scenario, which Mr. Chambers testified was based upon current monthly figures converted to annual amounts, the Debtors list gross receipts of $223,750.00 less business expenses totaling $85,984.00,[17] plus crop insurance and subsidies of $50,000.00, for a net income of $187,766.00. TRIAL EXS. 40; 41. In contrast, the Debtors' "best

---

[17] The breakdown of expenses is as follows:  (1) $250.00 for advertising; (2) $100.00 for bank service charges; (3) $35,000.00 for fertilizer; (4) $3,500.00 for insurance; (5) $384.00 for office expenses of stamps, etc.; (6) $7,800.00 for rent of business property; (7) $3,500.00 for repairs; (8) $1,000.00 for supplies; (9) $2,500.00 for taxes; (10) $18,000.00 for fuel; (11) $1,200.00 for telephone; (12) $750.00 for utilities; and (13) $12,000.00 for wages. TRIAL EXS. 40; 41.

case" scenario evidences gross receipts of $380,000.00 less business expenses totaling $100,750.00,[18] which would indicate a net income of $279,250.00, notwithstanding any additional amounts received for crop insurance and subsidies. TRIAL EX. 42. The Debtors did not, however, offer any testimony as to where they derived the gross receipts in the "best case" scenario.

As evident from all of the income and expense documentation in the record, the Debtors have not proved an ability to sufficiently fund their Amended Plan. Their projected monthly income figures range anywhere from $22,923.00 (TRIAL EX. 11) to $26,353.33, which is their projected annual income of $316,240.00 evidenced on Trial Exhibit 8, divided by twelve months.[19] These figures do not, however, begin to match up with the actual average monthly income of $4,636.77 reflected in the Debtors' monthly operating reports filed in connection with this bankruptcy case. And while those reports do not include any crop insurance and subsidies income, the maximum amount the Debtors stand to receive in proceeds is $60,000.00, which translates to $5,000.00 per month. The court also recognizes that the monthly operating reports do not include the fall corn harvest, but the discrepancies in the numbers reflected within the documents in the record are too significant, and the explanation offered by the Debtor was not convincing that the Debtors will have sufficient income to make the $125,172.00 annually required under the Amended Plan.

---

[18] The breakdown of expenses are as follow: (1) $500.00 for advertising; (2) $150.00 for bank service charges; (3) $35,000.00 for fertilizer; (4) $3,500.00 for insurance; (5) $400.00 for office expenses of stamps, etc.; (6) $10,000.00 for rent of business property; (7) $10,000.00 for repairs; (8) $1,200.00 for supplies; (9) $2,500.00 for taxes; (10) $20,000.00 for fuel; (11) $1,500.00 for telephone; (12) $1,000.00 for utilities; and (13) $15,000.00 for wages. TRIAL EX. 42. No explanation for the increase for several expenses was offered.

[19] As previously stated, these figures do not take into account any expenses associated with operating the farm. See TRIAL EX. 9. Utilizing the $86,000.00 annual farm expense figures projected by the Debtors for 2008 - 2009, these figures would be reduced by $7,166.67 monthly, or to $15,756.23 and $19,186.66, respectively.

In addition to the Debtors' Amended Plan not being feasible in general, it is also not feasible with respect to the proposed treatment of Citizens First Bank's Claim No. 24, individually. Feasibility must be considered in cases where a plan proposes to pay present value under § 1225(a)(5)(B)(ii) "because there must be a likelihood that the debtor has sufficient disposable income to pay the claim as required by the Code," *In re Torelli*, 338 B.R. 390, 397 (Bankr. E.D. Ark. 2006), but with respect to Citizens First Bank's Claim No. 24, the Amended Plan does not provide for payment of the present value of the claim.

Rather than constituting a separate basis for objecting to confirmation as initially raised, Citizens First Bank's argument that the Debtors' proposed treatment of its claims, to be paid over a period of ten years, is unfair and inequitable because the loans were initially short-term and fully matured at the time the Debtors filed their case, instead falls squarely within the scope of feasibility. Courts have held, generally, that "claims secured by real estate can be stretched out the longest." *In re Richards*, 2004 Bankr. LEXIS 388, at *12, 2004 WL 764526, at *4 (Bankr. N.D. Iowa Apr. 2, 2004). Moreover, § 1225(a)(5) "applies not only to long-term debts but to short-term debts that have matured prior to the commencement of the case[,]" thus allowing debtors to propose a Chapter 12 plan which restructures a loan obligation extending beyond the length of the plan. *Torelli*, 338 B.R. at 394; *see also In re Yett*, 2003 Bankr. LEXIS 2250, at *11, 2003 WL 25273832, at *3 (Bankr. D. Idaho Apr. 2, 2003) ("Decisional law recognizes that fully matured obligations may be restructured over several years under a chapter 12 plan."), *aff'd by Wells Fargo Bank NW, N.A. v. Yett (In re Yett)*, 306 B.R. 287 (B.A.P. 9th Cir. 2004).

> The only time limits on payment of secured debt are those which are implied by the present value language of 1225(a)(5), and the feasibility test of 1225(a)(6). Under

1225(a)(5), the rights of the unconsenting secured creditor can be modified only if, among other things, the creditor retains its lien on the security and receives collateral with a present value not less than the amount of the secured claim.

*In re Bluridg Farms, Inc.*, 93 B.R. 648, 654 (Bankr. S.D. Iowa 1988). Section 1222(c) clearly places a five-year limitation upon the length of a Chapter 12 plan, except as provided in subsections (b)(5) and (b)(9), which allow, respectively, for the extension of a plan beyond the five-year date in order to cure a default and make maintenance payments on claims for which the final payment is due after the plan duration, or to allow for the cramdown of a secured claim in a manner consistent with 11 U.S.C. § 1222(b)(5) (2005).[20]   The latitude to extend payments beyond five years "is one of the Code's 'most significant' provisions affecting secured creditors in Chapter 12." *Elk Creek Salers, Ltd.*, 286 B.R. at 391. "[T]he test is simply whether, as of the effective date of the plan, the present value of the property distributed – i.e., the new thirty-year mortgage – is equal to or greater than the amount of the allowed secured claim." *Travelers Ins. Co. v. Bullington*, 878 F.2d 354, 357 (11th Cir. 1989).

---

[20] Section 1222 of the Bankruptcy Code outlines mandatory and permissive provisions for Chapter 12 plans including a provision for payment of future earnings to the trustee, payment in full of all priority claims, and equal treatment of claims within each class. *See* 11 U.S.C. § 1222(a) (2005).

Specifically, § 1222(b) provides that

[T]he plan may—

. . . .

(5) provide for the curing of any default within a reasonable time and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due; [and]

. . . .

(9) provide for payment of allowed secured claims consistent with section 1225(a)(5) of this title, over a period exceeding the period permitted under section 1222(c)[.]

11 U.S.C. § 1222(b) (2005).

22

The Debtors' proposed treatment of Citizens First Bank's Claim No. 24 – essentially, the payment of interest only for several years and inclusion of a balloon payment at the end – is not, in and of itself, unreasonable, even in light of the testimony by James David Harris, Senior Vice President and Senior Lending Officer for Citizens First Bank, that, were it a loan, the terms are not customary in the industry and it is not a loan that Citizens First Bank would normally make. Nevertheless, "'[v]alue' must be determined objectively. Simply because a creditor subjectively would not extend a mortgage on the same terms does not mean that objectively the mortgage does not have a given value." *Travelers Ins. Co.*, 878 F.2d at 358. Moreover, "[b]alloon payments are commonly part of chapter 12 plans[, and c]ourts that have considered balloon payments, and the need to refinance to make those payments, have looked at the probability of successfully refinancing, particularly by evaluating the existing equity in the property and projected equity at the time of refinancing." *In re Field*, 2005 Bankr. LEXIS 2343, at *28, 2005 WL 3148287, at *8 (Bankr. D. Idaho Oct. 17, 2005); *see also Euerle Farms, Inc. v. State Bank (In re Euerle Farms, Inc.)*, 861 F.2d 1089, 1090 (8th Cir. 1988) (holding that the debtor's income and expenditure projections that were so inconsistent with past performance indicated no possibility that such projections could be met and did not offer realistic expectations that the debtor would be in a position to make balloon payments from future income).

Those factors notwithstanding, historical data is highly instructive for evaluating a plan's "doability," *Howard*, 212 B.R. at 880, and plans including a balloon payment are highly scrutinized and oftentimes not confirmed "unless there is proof of circumstances likely to produce a bucket of cash at just the right time to make the payment." *Michels*, 301 B.R. at 17 (internal citations omitted).

Although the Debtors acknowledge that they would be required to pay the balance of Citizens First Bank's claim in full at the end of the ten-year plan through a balloon payment, no matter the amount, they did not offer any real evidence to support their ability to do so. Based upon the previously discussed feasibility problems with respect to the Debtors' income and expenditures, the court likewise finds that the Debtors have not evidenced the potential to make the proposed balloon payment to Citizens First Bank at the end of the plan, nor have they sufficiently evidenced an ability to sell the "river front" property as proposed, which is likewise a necessary event with respect to payment of Citizens First Bank's claim.

At trial, Mr. Chambers testified that, based upon the most recent tax appraisal and conversations he has had with realtors, he believes the farm to be worth $1,500,000.00 and the value of the house to be $175,000.00.[21] A 2006 appraisal obtained by Citizens First Bank in connection with a loan incurred by the Debtor to purchase additional cattle assigns the house a value of $175,000.00 and the farm a value of $1,200,000.00, for a total of $1,375,000.00. TRIAL EX. 26. Thomas White, a certified appraiser with twenty-two (22) years experience and a crop farmer himself, appraised the property in connection with this litigation on October 21, 2008, and testified that, in his opinion, based upon comparable sales in the area, the farm is valued at $910,000.00 and the house is valued at $150,000.00, for a total of $1,060,000.00. TRIAL EX. 27.

With respect to the "river front" property, the Debtor explained that there are approximately fifty acres fronting the river that he does not use and plans to market and sell at auction for a minium

---

[21] In their Schedule A - Real Property, the Debtors assigned a total value of $1,600,000.00 to the house, barns, mobile home and land (of approximately 554 acres) located at 601 Chambers Road, Robbins, Tennessee, which the Debtor testified was based upon increases in real property in the area until recently. *See* COLL. TRIAL EX. 34.

of $300,000.00, which would then be paid to Citizens First Bank.  When questioned about this property, however, the Debtor testified that, presently, there is no right of way to the property and the property owner from whom he would have to obtain a right of way has refused to allow one, although the Debtor anticipates procuring a right of way from the property owner's children when the property owner, who is elderly, passes away.[22]  The Debtor also acknowledged that his plan to net a minimum of $300,000.00 from the sale of the "river front" property, which would need to occur by June 2009, based upon the provisions of the Amended Plan, was not a likely scenario, in light of the declining market and the lack of access to the property.

The Debtor's testimony concerning the prospects for selling the "river front" in the current market was mirrored by that of Mr. White, who testified that he personally viewed the property, consisting of approximately 3,000 feet of steep frontage on the river with difficult access, and that without better access, it would be difficult to sell, especially in the present unstable economic market.  Mr. White also testified that it would be expensive to put in a road and utilities to the property, or otherwise develop it, and those factors would affect the marketability as well.

As evidenced by this consistent testimony, there is little question that the sale of the "river front" property for anywhere near $300,000.00 at this point in time is unlikely and is wishful at best. Nothing in the record has satisfied the court that the Debtors have an ability to sell the "river front" property with any degree of certainty within the next ten years, much less within the next several months as stated in the Amended Plan as a necessary possibility.  As such, the Debtors' reliance

---

[22] The Debtor also testified that he is only aware of one junior lienholder on the "river front" property who has agreed to release the lien, but he did not give any further details, so the court does not know the identity of this lienholder or the amount of the junior lien.

upon this as a method of payment to Citizens First Bank on its Claim No. 24 is purely speculative and does not provide an adequate basis for present value pursuant to § 1225(a)(5)(B)(ii).

In order to be confirmed, a plan must be feasible, and courts will only approve plans that have "a rational likelihood of success." *Michels*, 301 B.R. at 17.  The Debtors have not proved their ability to fund the Amended Plan, much less that they can sell the "river front" property and/or make a substantial balloon payment to Citizens First Bank at the end of the plan's ten-year term.  As such, they have not evidenced a rational likelihood of success, and the Amended Plan is not feasible as required by § 1225(a)(6).

## B

Citizens First Bank has also objected to confirmation for lack of good faith.  As required by § 1225(a)(3), in order to be confirmed, a court must determine that, based upon the totality of the circumstances following a factual inquiry, the plan was proposed in good faith.  *Barger v. Hayes County Non-Stock Co-op (In re Barger)*, 233 B.R. 80, 83-84 (B.A.P. 8th Cir. 1999).  "Although not defined under the Code, 'good faith' is generally interpreted to mean 'a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code.'" *Mann Farms, Inc.*, 917 F.2d at 1214 (citations omitted).  Pre-petition conduct is a consideration but is not determinative; additionally, courts should "focus on factors such as whether the debtor has stated debts and expenses accurately; whether the debtor has made any fraudulent misrepresentation to mislead the bankruptcy court; or whether the debtor has unfairly manipulated the Bankruptcy Code." *Barger*, 233 B.R. at 83-84.

26

To summarize, the good faith requirement prevents confirmation of plans proposed by those who are dishonest with the court or creditors, uncooperative, inequitable in their dealings, or who attempt to manipulate the bankruptcy process.  A debtor's prepetition actions can serve as the basis for finding bad faith, but such actions must demonstrate the debtor was trying to treat creditors inequitably or otherwise hinder, delay, or defraud them.  Acts reflecting poor judgment but motivated by a good faith intent to achieve legitimate goals will not likely support a finding of bad faith.  Finally, in some cases, even activity that suggests bad faith can be satisfactorily explained or rebutted.

*In re Nelson*, 291 B.R. 861, 866 (Bankr. D. Idaho 2003).  "In essence, the good faith inquiry looks at the debtor's fairness in dealing with creditors."  *Barger*, 233 B.R. at 84.

Citizens First Bank raises good faith, in part, due to the Debtors' failure, on several occasions, to pay proceeds received from various sources over to it as required by its loan documents and liens.  At trial, the Debtor testified that in November or December 2007, he sold silage but did not pay the proceeds to Citizens First Bank, instead, using the money to live on and for operational costs.  He also testified that he used the insurance proceeds received last year to pay combine costs, that he used proceeds from the sale of hay to purchase a $16,000.00 Peterbilt truck, that he used the $24,000.00 received from the federal government for drought relief for his spring planting and operational expenses, and that he received $54,300.00 as payment for an oil and gas lease dated August 20, 2008, with CNX Gas Company, LLC, which he used to harvest his crops, repay a loan to his mother, put down a deposit on seed corn to lock in the price, pay for spring seed corn still owed, repay a couple of small loans, and catch up with backpay owed to his laborers. *See* TRIAL EX. 23.  Furthermore, the Debtor acknowledged that he misrepresented to Citizens First Bank that he would be receiving deferred payments of $10,000.00 annually from the oil and gas lease although he had already received the entire $54,300.00 due under the lease.

27

The Debtors' failure to pay over these proceeds to Citizens First Bank clearly evidences bad judgment on their behalf; however, bad judgment does not necessarily equate to bad faith. The evidence is clear that this nearly $125,000.00 was almost entirely reinvested back into the farm and used to pay operating costs, pay for seed, pay household expenses, and pay for labor. There is no indication that the Debtors intended to defraud Citizens First Bank by not repaying these funds, but were, in fact, doing everything in their power to make their farm profitable. In fact, the Debtor testified that the reason they filed their Chapter 12 bankruptcy case was to save their farm from Citizens First Bank's impending foreclosure.

The crux of Citizens First Bank's good faith argument lies in the fact that the Debtors have proposed their Amended Plan based upon their "best case" scenario, without sufficient income to back it up. At trial, the Debtor testified that the proposed treatment of Citizens First Bank's Claim No. 24 in the Amended Plan is dependent upon a minimum net from the sale of the "river front" property of $300,000.00, which is not a likely scenario. Additionally, as demonstrated yet again by the fact that the Debtors were required to use their drought relief funds and the entirety of the oil and gas lease proceeds to pay operating costs, the Amended Plan is not feasible and does not have a reasonable likelihood of success based upon anything other than the Debtors' wishful thinking.

The court finds that the Debtors have not satisfied the requirements of 11 U.S.C. § 1225(a)(6) and that their Amended Plan filed on August 20, 2008, is not feasible and cannot be confirmed. The court will set a status conference to consider whether the Debtors wish to dismiss their case or convert to Chapter 7.

28

An order consistent with this Memorandum will be entered.


FILED:  November 20, 2008

BY THE COURT

*/s/  RICHARD STAIR, JR.*

RICHARD STAIR, JR.
UNITED STATES BANKRUPTCY JUDGE